IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 30, 2011

## IN RE NOAH D. AND KEVIN D.

**Appeal from the Circuit Court for Pickett County**
**No. 2010CV13     John J. Maddux, Jr., Judge**

---

**No. M2011-01087-COA-R3-PT - Filed January 20, 2012**

---

The trial court terminated the parental rights of the mother of two children on the grounds of abandonment by failure to establish a suitable home, persistence of conditions, and severe child abuse. Mother appeals, contending that the evidence does not clearly and convincingly establish the grounds of termination. We affirm the termination of the mother's parental rights on the grounds found by the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

James Reed Brown, Byrdstown, Tennessee, for the Appellant, Jessica S.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; and Lindsey O. Appiah, Assistant Attorney General, for the Appellee, State of Tennessee.

## OPINION

The Department of Children's Services ("the Department") instituted a proceeding on August 28, 2009, in the Juvenile Court for Pickett County to have the two children of Jessica S. and Steven D., Noah D., born May 6, 2008, and Kevin D., born June 22, 2009, declared to be dependent and neglected and placed in the Department's custody. The children came to the attention of the Department on August 21 as a result of a referral that Kevin was neglected nutritionally. A Protective Custody Order was entered placing both children in the temporary custody of the Department and a preliminary hearing was held on September 3. Following the hearing an order was entered continuing the children's placement with the Department pending an adjudicatory hearing, set for October 30. After several continuances, the hearing was held on May 7, 2010, and an order entered holding the children to be

dependent and neglected and finding Kevin to be the victim of severe child abuse. The adjudication of the children to be dependent and neglected was appealed to the Pickett County Circuit Court.[1]

On November 22, 2010, the Department filed a petition in Pickett County Circuit Court seeking to terminate the parental rights of both parents on the grounds of abandonment by failure to establish a suitable home, persistence of conditions, and severe child abuse. Additional grounds of abandonment by incarcerated parent and substantial non-compliance with permanency plan were alleged against Steven. Trial was held on March 31, 2011, and on April 7 the court entered a Final Decree of Guardianship, sustaining the grounds for termination as alleged, holding that termination of the parental rights of both parents was in the best interest of the children, and terminating the parental rights of Jessica and Steven. By separate order entered on April 7, the court considered Jessica and Steven's *de novo* appeal of the May 7, 2010 juvenile court order holding both children to be dependent and neglected and placing them in the custody of the Department. The circuit court held that both children were dependent and neglected and that Kevin was the victim of severe child abuse perpetrated by Jessica and Steven, and ordered that the children remain in the custody of the Department. Jessica appeals the orders, raising the following issues:

> 1. Whether the Appellant has abandoned her children by failure to provide a suitable home.
> 2. Whether persistent conditions exist which prevent a return of the children to the Appellant.
> 3. Whether the Appellant has committed severe child abuse.

Steven does not appeal.

STANDARD OF REVIEW

Parental termination proceedings are governed by statute and involve a two-step process. *See* Tenn. Code Ann. § 36-1-113. First, a party seeking to terminate the parental rights of a biological parent must prove at least one of the statutory grounds for termination. Tenn. Code Ann. § 36-1-113(c)(1); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Secondly, the party must prove that termination of the parental rights of the biological parent is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2). Because of the fundamental nature of the parent's rights, courts

---

[1] Petitions to set support against the parents were also filed in Pickett County Juvenile Court by the State of Tennessee, through the Assistant District Attorney General, on January 28, 2010. The record on appeal does not show the disposition of those petitions.

require a higher standard of proof in deciding termination cases. *Santosky v. Kramer*, 455 U.S. 745, 769; *Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Thus, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.* at 653.

This Court never takes the issue of terminating parental rights lightly, due to the grave consequences that accompany such decisions. *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky*, 455 U.S. 745, 787 (1982) (Rehnquist, J., dissenting)) ("[f]ew consequences of judicial action are so grave as the severance of natural family ties."). In accordance with Tenn. R. App. P. 13(d), this Court reviews the trial court's findings of fact *de novo* with a presumption of correctness unless the evidence preponderates otherwise. In cases of parental termination, we determine whether the facts, either as found by the trial court, or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007). Whether a ground for termination has been proven by clear and convincing evidence is a question of law, which we review *de novo*, with no presumption of correctness. *In re S.H.*, No. M2007-01718-COA-R3-PT, 2008 WL 1901118, at *4 (Tenn. Ct. App. Apr. 30, 2008) (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007); *In re Valentine*, 79 S.W.3d at 548)).

## DISCUSSION

I. Abandonment by failure to provide a suitable home

Tenn. Code Ann. § 36-1-113(g)(1) provides that abandonment, as defined at § 36-1-102, is a ground to terminate parental rights; among the definitions of "abandonment" is § 36-1-102(1)(A)(ii), which states:

> (ii) The child has been removed from the home of the parent(s) or guardian(s) as a result of a petition being filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department . . . that the juvenile court found . . . that the department . . . made reasonable efforts to prevent removal of the child . . . and for a period of four months following the removal, the

department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date...

Tenn. Code Ann. § 36-1-102(1)(A)(ii).

In the order terminating Jessica's parental rights, the court found that, following removal of the children, the efforts expended by the Department included:

> . . . making the children available for visitation, providing the parents with a written calendar of visitation dates, child and family team meeting dates and parenting sessions, arranging and paying an interpreter for the deaf to be present for parenting education, child and family team meetings and court hearings, coordinating vocational rehabilitation services for the father, coordinating and paying for a psychological evaluation for the mother, attempting to arrange a psychological evaluation for the father, providing parenting education and coordinating with TEIS and HUGS to make sure the children were getting services from both agencies.

The court also found that the parents' lack of reasonable efforts "include not actively participating in the parenting education and not addressing the severe neglect they perpetrated against their children, resulting in both children having been diagnosed as failure to thrive." Jessica contends that, if we find the department's efforts to be reasonable, then the fact that she participated in those programs "can only mean that she made reasonable efforts." We disagree with her interpretation of the statute as well as its application to the facts of this case.

In *In re Giorgianna H.*, 205 S.W.3d 508 (Tenn. Ct. App. 2006), this Court explained the standard to be applied in assessing the efforts of the Department in providing assistance to families facing challenges similar to those presented here:

> The reasonableness of the Department's efforts depends upon the circumstances of the particular case. The factors that courts use to determine the reasonableness of the Department's efforts include: (1) the reasons for separating the parent from his or her children, (2) the parent's physical and mental abilities, (3) the resources available to the parent, (4) the parent's efforts to remedy the conditions that required removal of the children, (5) the

-4-

resources available to the Department, (6) the duration and extent of the parent's remedial efforts, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*In re Giorgianna H.*, 205 S.W.3d at 519 (citations and footnotes omitted).  The parents' responsibility, separate from the Department's, was described as follows:

When reunification of the family is a goal, the parents share responsibility for addressing these conditions as well.  Thus, parents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from their custody.

*Id.*  (Citing *State Dep't of Children's Servs. v. B.B.M.,* 2004 WL 2607769, at *7; *In re C.M.M.,* 2004 WL 438326, at *7; *In re R.C.V.,* No. M2001–02102–COA–R3–JV, 2002 WL 31730899, at *12 (Tenn.Ct.App. Nov.18, 2002) (No Tenn. R.App. P. 11 application filed)).

In *In re A.D.A.*, 84 S.W.3d 592 (Tenn. Ct. App. 2002), this court considered a trial court's finding of abandonment under Tenn. Code Ann. § 36-1-102(1)(A)(ii) on the part of a mother who struggled with a cocaine addiction.  Instructive in the court's application of the statute was the following language:

We agree with the testimony presented by the State that a suitable home requires more than a physical space.  A.D.A. is a child with permanent injuries who requires constant care.  For him, a suitable home requires the presence of a care giver who can supply the care and attention he needs.

*In re A.D.A.*, 84 S.W.3d at 599.

Linda Barnes, a home visitor employed by the HUGS Program of the Tennessee Department of Health,[2] testified that she had been working with Jessica and Steven since May 12, 2008, one week after the birth of their first child, Noah, and that she made twenty-

---

[2] As detailed in a trial exhibit, the HUGS program is a home visiting program operated through the county health department.  The home visitor provides information and education on: care of the newborn and new mother; how the newborn will grow and develop; feeding, including help with formula and breast feeding problems and when to start solid foods; physical examinations; and activities to help with developmental growth.

seven home visits at which she taught both Jessica and Steven the importance of proper feeding and nutrition, including how to properly mix formula in bottles.[3]

The children were removed from the custody of the parents and placed with the Department as a result of the dependent and neglect petition filed on August 28, 2009, two months after the birth of the second child, Kevin. Dr. Matthew King testified that he first came into contact with Kevin on August 7 and admitted him to the hospital on August 21 in order to monitor his feeding habits and weight due to continuing concerns about Kevin's weight loss and apparent malnutrition. Sara Tungate, Family Service Worker with the Department, testified that Kevin was in the following condition at the time she was assigned the case:

---

[3] Ms. Barnes testified with respect to the visits beginning in 2008, in pertinent part, as follows:

Q.   What sort of things did you do for them in addition to what you've already testified to about demonstrating and making sure they understood how to properly mix formula in bottles?

A.   Normally the way our curriculum works when the baby turns four months old is when we start doing our developmental assessments. I try to show the moms and dads, the parents, what we do; I will demonstrate it, and also those curriculums have pictures. Like if I am wanting to show them how to start working with motor skills with the baby, say they are four months old I am going to put them on the floor, I want to watch them start to hold their head up so long. And I try to encourage the parents we are doing this for a reason, this is how we are teaching this baby to learn its skills. We do this each month.

* * *

Q.   What about [Jessica], did you have adequate time with her to teach her how to properly prepare the formula and how frequently to feed the baby?

A.   Right. We went over that quite often because of the baby being little, and not over-feeding. I believe he had to have one or two formula changes. A lot of times with the little ones things don't agree. We went over that, you know, just feed a couple of ounces at a time, and make sure you have to burp them, maybe give them a little bit more then, and not just fix no great big six or eight ounce bottle and give them the whole thing. So we went over that throughly on the feedings.

Q.   When you went in the home did you actually wash and sterilize bottles?

A.   We went over everything in their kitchen, yes.

* * *

Q.   Did you do your best to follow the set schedule and time and notify the [Jessica and Steven] so that you could provide services to Kevin as well?

A.   Yes. I feel like I did my best with the children, and also for Jessica when she was prenatal. And even after she had Noah we worked together trying to get her on family planning, and take her to the Health Department. I worked with the family as close and best I could.

-6-

He was extremely malnourished. His arms were tiny. His stomach was distended. His face was almost emaciated. He just laid; he was lethargic a lot of the times when I first saw him.

Ms. Tungate testified at length regarding interactions and team meetings she held with Jessica and Steven after the children were removed, and particularly her observation of the visitations Jessica and Steven had with Noah and Kevin. While much of her testimony related to Steven, Ms. Tungate related incidents of Jessica bringing inappropriate snacks for the children to the visitation sessions; allowing the children to be in the presence of her mother's paramour, a registered sex offender; allowing Steven to engage in inappropriate horseplay with Noah; failing to timely attend to the children's needs for a change of diapers; and her unstable living arrangements. With specific reference to Jessica, Ms. Tungate testified:

Q. Tell me about the lack of reasonable efforts on behalf of the parents, and again we are talking about that first four month period only after the children were placed in foster care.

A. . . . Both [Steven and Jessica] had had housing at the time that DCS was involved, but during those first four months they had left housing and moved to a different facility; so there was unstable housing during that time as well. There was a lot of domestic issues.

Q. Elaborate what you mean. Between who?

A. Between [Steven and Jessica].

Q. What do you mean by domestic issues?

A. [Jessica] had called the police because of a verbal and physical altercation that had occurred at the home, in which ultimately led to eviction from where they were staying.

Q. Did either parent during that first four month period acknowledge that their actions had led to Kevin's failure to thrive and his near death?

A. Yes. In the child and family team meeting both parents admitted to not feeding Kevin when they knew they were supposed to.

Q. Did they address that issue during the first four month period beyond just admitting to it?

A. No. There was never responsibility taken for their action of not feeding Kevin.

Tenn. Code Ann. § 36-1-102(1)(A)(ii) clearly contemplates that the efforts to be expended by the Department and those to be expended by the parents, while directed toward the same goal, are independent of each other. The evidence shows that the efforts of the Department in this case were directed toward getting both parents to address basic issues

relating to their lack of knowledge and competence in parenting. In contrast, the efforts required of Jessica went beyond mere attendance at visitation and attending parenting sessions and included demonstrating, on a consistent and continual basis, her competence as a parent. Noah and Kevin each suffered from a lack of care and appropriate parenting in the early days, months and years of their lives and, as a consequence, the understanding and application of the instruction and assistance Jessica received was the measure by which her efforts would be gauged. Although the record does not show that Jessica's situation was as extreme as the mother in *In re A.D.A.*, the principle of the case holds–a suitable home for Noah and Kevin require someone who can supply the attention and care they need on a consistent basis. The record supports the court's determination that Jessica failed to establish a suitable home for the children.

## II. Persistence of Conditions

Tenn. Code Ann. § 36-1-113(g)(3)[4] allows for the termination of parental rights where a child has been removed from the parent's custody for a period of six months and the conditions which led to the child's removal persist. With respect to the persistence of conditions, the trial court held:

41. The conditions that led to the removal of the children from the home of [Jessica] and [Steven] were the history of neglecting the children and knowing failure to feed Kevin as instructed by the child's doctor, resulting in serious malnutrition.
42. The conditions that prevent the children's return to the parents' home are the lack of stability in housing, failure to address the issues that caused the

---

[4] Tenn. Code Ann. § 36-1-113(g)(3) provides:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[;]

severe neglect of their infant child by not feeding him to the extent he was significantly malnourished . . . .[5]

The evidence relative to each child's condition, the nature of the parenting challenges facing Jessica, and her inability to apply, on a consistent basis, the information she was receiving in the parenting classes also supports the holding that the conditions which led to the children's removal persisted and prevented the safe return of the children.[6] Significant in this regard is the testimony of Ms. Tungate that a psychologist who examined Jessica cautioned that his determination that she had the ability to learn parenting skills was not a determination that she would "follow through with parenting a child." Significant also is the fact that, despite Jessica and Steven being provided parenting instruction shortly after the birth of their first child, the filing of the dependent and neglect petition, which led to the children's removal, was prompted by concerns about their care of the second child.

---

[5] The court made additional findings with respect to Steven relative to the ground of persistence of conditions.

[6] Ms. Tungate also testified as follows:

Q.    What were the conditions that caused the children to be removed?
A.    That Kevin was failure to thrive.
Q.    Kevin was near death, wasn't he?
A.    Yes.
Q.    That's what this case is about - a child who almost died?
A.    Yes.
Q.    Due to the parents admitted failure to feed him properly?
A.    Yes.
Q.    Let's talk about [Jessica] first. What are the conditions, in addition to the failure to feed Kevin prior to his removal, what are the conditions that prevent the children from being returned to her at this time?
A.    At the time she currently does not have stable housing. She, in the past two months, has lived at at least three different places. She currently does not have any legal means of income to support her children.
Q.    Anything else?
A.    As far as demonstrated change there are concerns still that there is not a responsibility that was taken of her behavior changes, admitting that she did not feed Kevin.
Q.    She made the admission but she has not taken responsibility for change; is that what you are saying?
A.    Yes.
Q.    For that matter is she demonstrating through the food she is bringing to the visitations that she has not made a change in her behavior to make sure that the children receive proper nutrition?
A.    Yes.

-9-

Considering the entire evidence, persistence of conditions was clearly and convincingly shown. *See Matter of M.W.A., Jr.*, 980 S.W.2d 620 (Tenn. Ct. App. 1998) (persistence of conditions shown where, *inter alia*, parents failed to show that their parenting skills had improved.)

III. Severe Child Abuse

As the third ground of termination of parental rights, the court held that Jessica and Steven committed severe child abuse against Kevin in "their knowing failure to adequately feed their infant resulting in serious malnutrition and failure to thrive." Jessica contends that the Department did not show a knowing failure to feed, particularly in light of the fact that she regularly took Kevin to his doctor's appointments and that "neither of Kevin's doctors told [Jessica] to feed Kevin as much as he was fed when he went to the hospital."[7]

In support of its holding, the court stated the following:

The finding of severe child abuse of [Kevin] perpetrated by [Steven] and [Jessica] is based upon the following findings of fact:
A.    The parents neglected to feed the child, [Kevin], in the manner in which they had been instructed by the child's doctors.
B.    The nutritional neglect resulted in the child being hospitalized for failure to thrive and eventually in a diagnosis of malnourishment.
C.    The Court finds Dr. Matthew King's testimony during deposition to be credible and reliable. He specifically stated the following:
   a.    [Kevin] suffered from protein and calorie malnutrition because the child was not receiving enough protein or calories.
   b.    That the parents had been instructed on how to feed the child and showed an understanding of those instructions. The mother was able to recall the instructions from a previous visit and correctly related them to Dr. King, but the child had lost weight.
   c.    That the diagnosis of malnutrition is life threatening.
   d.    That all other potential causes for the diagnosis were ruled out.

---

[7] Jessica's brief fails to include citations to the record in support of her argument, as required by Tenn. R. App. P. 27(a)(7)(A). Notwithstanding this omission, we have reviewed the record in its entirety to address all issues raised. *See Lykins v. Key Bank USA, NA, et al.*, No. E2005-01572-COA-R3-CV, 2006 WL 2482963, at *5 (Tenn. Ct. App. Aug. 29, 2006) ("Courts have routinely held that the failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief as required by Rule 27(a)(7) constitutes a waiver of the issue. . . . This Court is under no duty to verify unsupported allegations in a party's brief. . . .").

e. The child immediately began to gain weight upon admission to the hospital and has continued to do so.

f. That there were symptoms associated with the diagnosis that would have been apparent to the caregivers.

g. That [Kevin] did suffer from, sustain, or was placed in immediate danger of suffering from or sustaining a wound, injury, disability, or physical or mental condition caused by brutality, neglect, or other actions, or inactions, of his mother and father.

h. That there is the potential for long term effects for a child going without proper nourishment which include diminished adult height, delayed development and potentially decrease in mental capacity as an adult.

i. That the actions and inactions of [Kevin]'s parents, [Steven] and [Jessica], do constitute knowing exposure of the child to, or the knowing failure to protect the child from abuse or neglect that was likely to cause great bodily harm or death.

j. That there is a risk for children associated with these caretakers of ongoing neglect, poor development, and potential future harm to their adult ability to cope with their surroundings due to mental...primarily mental capacity and if there was an inability to attain full genetic potential for their intelligence, that would limit them.

k. That he believed the parents, [Steven] and [Jessica], purposefully did not feed their child, [Kevin] adequately.

Tenn. Code Ann. § 37-1-102(b)(23)(A)(i)[8] defines "severe child abuse" as:

(A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;

(ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(d).

---

[8] The court cited the statute defining "severe child abuse" as Tenn. Code Ann. § 37-1-102(21). Tenn. Code Ann. § 37-1-102 has been amended numerous times; it was amended by Chapter 278, Public Acts of 1989, to create subsections (a) and (b). Chapter 411, Public Acts of 2009, added subsections 16 and 17 to the definitions at § 37-1-102(b) and provided that the then existing subdivisions would be renumbered as a result of the addition; consequently, the definition of "severe child abuse" is now codified at Tenn. Code Ann. § 37-1-102(b)(23).

(B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct;

(C) The commission of any act towards the child prohibited by §§ 39-13-502--39-13-504, 39-13-522, 39-15-302, 39-15-402, and 39-17-1005 or the knowing failure to protect the child from the commission of any such act towards the child; or

(D) Knowingly allowing a child to be present within a structure where the act of creating methamphetamine, as that substance is identified in § 39-17-408(d)(2), is occurring;

The factual findings of the court are fully supported by the testimony of Dr. King, whom the court found to be "credible and reliable"[9] and bring Jessica's neglect of the children within the plain wording of the statute. We affirm the court's finding in this regard.

---

[9] In pertinent part, Dr. King testified:

Q.  If it continued, I believe you said it was life threatening; is that right?
A.  Very life threatening. I can safely say he was the sickest child I had seen that calendar year.
Q.  Is there any potential for any long term effects for a child going without the proper nourishment?
A.  Yes, ma'am. Long term effects can include diminished adult height, and delayed development, and potentially decrease in mental capacity as an adult.
Q.  All serious conditions?
A.  Yes.
* * *
Q.  What are the risks to this child or other children, such as his brother, with the same caretakers if the children are not protected from caretakers who have committed what the department has alleged they have committed?
A.  The risk would be ongoing neglect, poor development, and potential future harm to their adult ability to cope with their surroundings due to mental . . . . primarily mental; the physical loss of adult height shouldn't affect them long term, but certainly if there was an inability to attain full genetic potential for their intelligence, that would limit them.

## CONCLUSION

For the foregoing reasons, the order of the Circuit Court is AFFIRMED.

Costs of this cause are assessed to Jessica S.

_____

RICHARD H. DINKINS, JUDGE